IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES STEEL CORPORATION,   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | |
| v.   ) | Consolidated Civil Action No. 02-2108 |
| ) | |
| LUMBERMENS MUTUAL CASUALTY   ) | |
| COMPANY, FEDERAL INSURANCE   ) | |
| COMPANY,   ) | |
| ) | |
| Defendants.   ) | |

<u>MEMORANDUM ORDER</u>

CONTI, District Judge

      The central issue pending before the court in the parties' cross-motions for summary judgment is whether, under the undisputed factual record developed in discovery, plaintiff United States Steel Corporation ("plaintiff" or "USS") is obligated to pay defendants Lumbermens Mutual Casualty Company ("Lumbermens") and Federal Insurance Company ("Federal" and, together with Lumbermens collectively, "defendants") a premium for terminated workers' compensation bonds. Because the court concludes under the facts presented that plaintiff is not obligated to pay a premium for terminated workers' compensation bonds, the court will deny defendants' motions for summary judgment. Correspondingly, plaintiff's motion for summary judgment with respect to Federal will be granted in its entirety. Plaintiff's motion for summary judgment with respect to Lumbermens' will be granted in part and denied in part for the reasons set forth below.

***Background***

**I.     SIWC Bonds in General**

USS is a large-scale steel manufacturer incorporated in Delaware with its principal place of business in Pittsburgh, Pennsylvania.  USS and Lumbermens' Amended Jt. Statement of Undisputed Material Facts (Doc. No. 38) ("L.J.S.F.") ¶ 1; USS and Federal's Jt. Statement of Facts (Doc. No. 36) ¶ 1 ("F.J.S.F.").  USS, which employs thousands of individuals in Pennsylvania and other states across the country, is subject to the workers' compensation laws of each state in which it operates.  F.J.S.F. ¶¶ 3-4; L.J.S.F. ¶ 4.  In at least twelve of those states, including Pennsylvania, USS was granted "self-insured" status and was permitted to obtain self-insured workers' compensation bonds to satisfy its obligation under the workers' compensation laws.  F.J.S.F. ¶¶ 4-7.  For example, employers subject to Pennsylvania's Workers' Compensation Act (the "Act"), PA. STAT. ANN. tit. 77 §§ 1 (2005) *et seq.*, can satisfy their obligations under the Act by either: (1) paying into the State Workmen's Insurance Fund; or (2) acquiring an exemption under the Act, such as being granted "self-insured" status by the Pennsylvania Bureau of Workers' Compensation (the "Bureau") pursuant to PA. STAT. ANN. tit. 77 § 501(a)(2); 34 PA. CODE § 125.9(b).  L.J.S.F. ¶¶ 6-7.  In order to achieve self-insured status, the Bureau, *inter alia*, requires an employer to secure a "self-insured workers' compensation bond," or "SIWC" bond, in a form and amount acceptable to the Bureau.[1]  Id. ¶ 8; F.J.S.F. ¶ 7.

The relationship between the self-insured and the surety is primarily governed by two separate documents: a SIWC bond containing language approved by the state, and an indemnity

---

[1]     Acceptable forms of security other than surety bonds include irrevocable letters of credit, a security deposit held under a trust agreement prescribed by the Bureau and maintained for the benefit of employees of the self-insurer, and cash as collateral.  34 PA. CODE § 125.9(b).

agreement requiring the employer to indemnify the surety in the event that the surety becomes

liable under the SIWC bond for an obligation owed to the state.[2]  F.J.S.F. ¶¶ 10-11.  Execution of

the SIWC bond creates a tripartite relationship between the principal (the self-insured), the

obligee (the state bureau of workers' compensation) and the surety, whereby the surety agrees to

satisfy the principal's obligation to the state up to the "penal sum" of the SIWC bond in the event

the principal defaults.  In consideration for the issuance of a surety bond, the principal generally

enters into an indemnification agreement with the surety and pays a premium calculated on the

basis of a specified rate per thousand dollars of liability bonded for a specified period, usually

annually.  Id. ¶¶ 9-10.  Because of an inherent feature of SIWC bonds known as "long-tail

liability," the termination of a SIWC bond by either the surety or the principal does not

extinguish the surety's liability for injuries or diseases that occurred prior to the effective date of

termination.  F.J.S.F. ¶¶ 12-14.[3]  Both defendants stipulated that they were aware of the nature of

---

[2]       In addition, some sureties require additional security to issue a SIWC bond, such
as: (1) collateral in the form of irrevocable letters of credit; and (2) "place in collateral letters"
obligating the self-insured to either: (a) obtain a discharge of the surety from liability, or (b)
submit acceptable collateral to the surety.  F.J.S.F. ¶ 11; L.J.S.F. ¶ 11.

[3]       For example, paragraphs 3 and 4 of the Pennsylvania bond form state as follows:

> 3.      The obligations of this surety bond shall cover and extend to all
> *past, present, existing, and potential liability* of the Principal
> incurred as a self-insurer to the extent of the Penal Sum of the bond
> without regard to specific injuries or exposures, date or dates of
> injury or exposure, happenings or events.

> 4.      This is a continuous bond and shall remain in full force and effect
> unless terminated in the manner hereinafter provided.  *If the bond
> is terminated, the Surety will remain liable under the provisions of
> this bond for all obligations of the Principal under the Acts which
> result from injuries or diseases that occur prior to the effective
> date of the termination*.  The Surety shall be released from its

long-tail liability – which diminishes over time as workers recover from their injuries or live out the remainder of their lives – when they entered into their respective indemnity agreements with plaintiff.  Id. ¶ 14-15; L.J.S.F. ¶ 16, 46.


## II.     SIWC Bonds Issued by Federal

Federal's relationship with USS spans back over a half-century.  Since 1954, Federal issued SIWC bonds to USS, for which USS was named as a principal and for which USS paid annual premiums to Federal.  F.J.S.F. ¶ 16.  On July 9, 1986, following the acquisition of Marathon Oil Co. ("Marathon") and the reorganization of U.S. Steel Co. into an entity named "USX Corporation" ("USX"), USX executed a general indemnification agreement with Federal. Id. ¶ 17; App. to USS and Federal J.S.F. (Doc. No. 37) ("F. App.") Ex. M.  USS paid a premium upon issuance of each of the twelve SIWC bonds issued by Federal ("Federal bonds"), and paid an annual premium thereafter.  Id. ¶ 18.  After Federal approached USS in 1998 and offered to reduce the annual premium, USS paid Federal an annual premium at a rate of $1.00 per thousand dollars bonded for each of the Federal Bonds at issue in this litigation effective January 1999.  Id. ¶ ¶ 19, 36.  Following the reorganization of USX in July 2001, Marathon Oil Co. and U.S. Steel Co. became separate public entities.  Both Federal and USS operated under the premise that USS became the successor by merger to USX Corporation, which did not contain the assets of

---

liability and the liability shall be extinguished if the Principal provides replacement security acceptable to the Bureau under its rules and regulations for payment of the obligations covered by this bond.  Under such condition, the Bureau will notify the Surety in writing of its releases from liability under this bond.

L.J.S.F. ¶¶ 13-14, Ex. A (emphasis added); F.J.S.F. ¶ 12.

Marathon.  Id. ¶ 20.  In August 2001, Federal requested USS to sign a new indemnity agreement

to reflect the reorganization, but USS refused.  Id. ¶ 23.  At that time Federal represented to USS

that, following the company's reorganization, an indemnity agreement was more important to

Federal than the amount of annual premiums.  Id. ¶ 24.

　　　Throughout the course of 2002, each of the twelve Federal bonds were terminated by the

parties.  Id. ¶ 37.  The terms of the Federal bonds entitled either USS or Federal to terminate

them unilaterally; Federal terminated seven bonds and USS terminated the remaining five.  Id ¶¶

37-38.  Both parties were aware that Federal remained liable for long-tail liability under the

terminated bonds.  For example, after the Pennsylvania bond was terminated, the Bureau notified

USS and Federal that Federal "would remain liable under the terms of the bond for all

obligations of the employer [USS] arising from injuries . . . that occurred prior to the effective

date of such termination."  Id. ¶ 40.  Prior to February 1, 2002, Federal did not charge USS a

premium for terminated bonds; rather, it was Federal's practice to refund USS a pro-rated

amount of a premium for a particular period in which a SIWC bond was terminated.  Id. ¶¶ 26-

27.[4]  In fact, in conformance with industry-wide practice, Federal did not charge USS a premium

for terminated SIWC bonds at any time during their nearly fifty-year relationship.  Id. ¶¶ 47-48.

---

[4]       Regarding Federal's practice of not charging a premium on terminated bonds, the
parties note as an example SIWC Bond No. 8064-41-54 (Pennsylvania).  That bond was
terminated on March 1, 1978, and, although Federal remains subject to long-tail liability under
the bond for obligations arising prior to the termination date, Federal never attempted to charge
USS a premium for ongoing exposure to pre-termination liability under the bond.  Id. ¶ 28.
Other terminated Federal bonds which have not been subject to post-termination premiums
include Bond Nos. 8092-97-65 (Arizona), 8133-37-74 (Oklahoma), 8064-42-59 (Tennessee), and
8089-38-82 (Virginia).  Id. ¶ 30.  Federal's practice of not imposing a premium on terminated
bonds applied irrespective of whether Federal was released from all liability under the bonds.  Id.
¶ 29.

In a letter dated February 1, 2002, Federal advised USS's insurance broker, Marsh USA ("Marsh") that it would begin charging USS premiums for all SIWC bonds terminated after June 27, 2001.  Id. ¶ 41.  Under what the parties have described as a "new approach," Federal began to invoice USS premiums at a rate of $6.00 per thousand dollars bonded for all SIWC bonds terminated after June 27, 2001.  Id. ¶¶ 42, 44.[5]  This new approach was also set forth in a modification to Federal's 2001 Surety Rate Manual.  The previous 1988 manual provided the following with respect to SIWC bonds:

> Upon the *surrender and/or revocation of a Workers' Compensation Self-Insurer's certificate*, license or permit to be a Self-Insurer, renewal premiums shall be charged annually on the anniversary date at the usual rates on the Bond Peanlty [sic] or on the total amount of outstanding reserves for open cases, whichever is smaller.  Such premium shall continue to be due until all liability has been extinguished on the bond or released by the Obligee.

Id. ¶ 32 (emphasis added).  That language, which concerned the cancellation of a self-insured's workers' compensation certificate, did not address the situation where a SIWC bond was cancelled by the surety or the principal.  The provision was modified in 2001 to state as follows:

> In the event the surety bond is *cancelled by the principal or surety* and such cancellation does not affect the surety's liability for compensation for injuries to the principal's employees and other comprehensible events occurring prior to the date of cancellation, renewal premium is charged.  Such renewal premium shall be based on the penal sum of the bond or on the total amount of the outstanding reserves for open cases as furnished by the principal, whichever is smaller. Annual renewal premium shall be charged until the surety is released from all liability by the obligee.

---

[5]     These bonds included the following: Bond Nos. 8150-39-48 (California), 8105-57-81 (Colorado), 8133-38-25 (Florida), 8105-58-70 (Kentucky), 8099-74-92 (Missouri), 8056-79-27 (Nevada), 8154-96-41 (New Jersey), 8106-37-28 (New York), 8096-63-57 (Pennsylvania), 8099-74-58 (Utah), 8154-98-86 (West Virginia), and 8154-43-28 (Wisconsin).  Id. ¶ 43. Federal's current surety rate manual provides for a maximum rate of $6.00 per thousand dollars bonded.  Id. ¶ 36.

Id. ¶ 33 (emphasis added).  The parties stipulated that neither the language of the bonds nor the general indemnity agreement authorized Federal to charge (or required USS to pay) any premiums for long-tail liability on the Federal bonds.  Id. ¶ 46.  USS did not agree to pay a premium on the terminated SIWC bonds. Id. ¶ 49.

### III.    SIWC bond issued by Lumbermens

Plaintiff's relationship with Lumbermens, a member company of Kemper Insurance Companies, began in late-1999 when plaintiff's surety broker, Marsh, was attempting to secure a bond with lower premium rates for plaintiff.  At that time, plaintiff maintained its self-insured status in Pennsylvania through Bond No. 8096-63-57 issued by Federal, and through an additional bond issued by St. Paul Fire and Marine Insurance Co. ("St. Paul")  L.J.S.F. ¶ 25.  As stated above, in 1999 Federal unilaterally offered to provide its SIWC bonds to USX at a premium rate of $1.00 per thousand dollars bonded.  Id. ¶ 26.  St. Paul also offered to lower its premium rates, but not to the extent offered by Federal.  Id.  Beginning in December 1999, Marsh and Kemper/Lumbermens[6] entered into negotiations to secure a Pennsylvania SIWC bond for USX.[7]  Id. ¶¶ 28-34.  The parties contemplated that Lumbermens would provide a Pennsylvania SIWC bond for USS for at least three years at a rate of $1.00 per thousand dollars bonded.  Id. ¶ 34.  On March 17, 2000, the parties executed a general indemnity agreement, and, on August 12, 2000, Lumbermens issued SIWC Bond No. 3S999892 ("Lumbermens bond") to USX.  Id. ¶ 38. The indemnity agreement and bond were the only two contractual documents that governed the

---

[6]     "Kemper" and "Lumbermens" are used interchangeably when referring to defendant Lumbermens Mutual Casualty Co.

[7]     As noted above, USS is the successor corporation to the entity formerly known as USX, which entered into the indemnity agreement with Lumbermens in 2000.

relationship between USX and Kemper/Lumbermens regarding the SIWC bond, and plaintiff was not required to provide any collateral in favor of the bond.  Id. ¶¶ 40, 44.  The Lumbermens bond was obtained to replace the SIWC bond issued by St. Paul, whose "past, present and future liability" was "totally extinguished."  Id. ¶ 41.  Kemper's 1999 Surety Rate Manual approved by the Pennsylvania Insurance Department did not contain any manual rule permitting the charging of a premium on terminated SIWC bonds.  Id. Ex. B.

Plaintiff accepted and paid the premium rate of $1.00 per thousand dollars for the annual period of August 12, 2000, through August 12, 2001.  Id. ¶¶ 42-43; Ex. G.  Lumbermens was aware of its long-tail liability obligations at the time it issued the SIWC bond to plaintiff.  Id. ¶¶ 16, 46.  Furthermore, Lumbermens (like Federal) stipulated for purposes of the cross-motions for summary judgment that, prior to 2001, it was an industry-wide practice that sureties did not charge a premium for terminated SIWC bonds.  Id. ¶ 18.

During the first annual period of the Lumbermens bond, USX underwent the corporate reorganization described above, which split Marathon and USS into two separate companies. Unlike Federal, however, Lumbermens took the position that USX and Marathon both remained as indemnitors under the general indemnity agreement.  Id. ¶ 51.  Notwithstanding this assertion, Lumbermens issued a formal surety bond rider to the Bureau that amended the SIWC bond by changing the principal named on the bond from USX Corporation to United States Steel LLC. Id. ¶ 52.  USS subsequently paid Lumbermens a premium of $1.00 per thousand dollars bonded for the first renewal term, August 12, 2001, through August 12, 2002.  Id. ¶¶ 53-55; Ex. H.

Throughout the period of the first renewal term, Kemper began reevaluating its business of providing SIWC bonds.  The financial collapse and bankruptcy of several major companies, such as Enron, K-Mart, and WorldCom, as well as the terrorist attacks on September 11, 2001,

had a substantial negative impact on Kemper/Lumbermens and other sureties.  <u>Id</u>. ¶ 61.  As a result, Kemper decided to exit the market for large SIWC bonds.  <u>Id</u>.  Kemper informed plaintiff in May 2002 that it would cancel the SIWC bond on August 12, 2002, unless the parties could reach an agreement on additional collateral to be provided in support of the bond.  <u>Id</u>. ¶ 62.  The parties did not come to an agreement on collateralization, and, on June 14, 2002, Kemper issued a cancellation notice to the Bureau terminating the Lumbermens bond effective August 12, 2002.  <u>Id</u>. ¶¶ 64-65.

The Bureau responded to Kemper's cancellation notice by sending a letter to Kemper confirming its receipt of the notice and stating: "[A]lthough further liability of this surety is terminated on and after August 12, 2002, the surety will remain liable under the terms of the bond for all obligations of the employer arising from injuries, as defined in the Workers' Compensation Act, as amended, that occurred prior to the effective date of such termination."  <u>Id</u>. ¶ 67.  As a result of the termination notice, plaintiff placed $6 million in trust with the Commonwealth to cover post-termination liabilities.  <u>Id</u>. ¶ 68.  Despite having terminated the Lumbermens bond, Kemper took the position that it was able to charge plaintiff a premium with respect to post-termination liability.  Kemper ultimately invoiced plaintiff a premium rate of $18.75 per thousand dollars bonded for the period of August 12, 2002, through August 12, 2003, in order to cover post-termination long-tail liability.  <u>Id</u>. ¶¶ 69-71.[8]

---

[8]     Kemper also apparently charged several other clients outside the Commonwealth of Pennsylvania premiums for terminated SIWC bonds, and produced evidence that Chubb Cincinnati charged premiums on SIWC bonds cancelled after June 27, 2001, as well.  <u>See</u> Lumbermens' Supp. Statement of Facts ("L.S.S.F.") (Doc. No. 32) ¶¶ 19-20.  The court notes that it is unclear from the record whether any or all of the clients charged post-termination premiums paid such premiums at the rates charged by Kemper and Chubb.  In addition, the court notes that the nature of the agreements between Kemper, Chubb and their respective clients is uncertain from the record.

By December 2002, Kemper was in the process of withdrawing from the surety market. Id. ¶¶ 74-75.  As a result, in early-2003, Kemper's financial ratings were downgraded by A.M. Best to a "B" rating, and by Standard and Poor's to a "BB" rating.  Id. ¶ 76.  The regulations promulgated by the Bureau require the surety bond to be issued by a surety company that possesses a "current A. M. Best Rating of B + or better or a Standard and Poor's rating of claims paying ability of A or better."  34 Pa. Code § 125.9(b)(1)(i).  In the event that the surety's ratings drop below the proscribed levels, the self-insurer is required to replace the bond with a new bond or provide another acceptable form of security.  Id.  The downgrade in Kemper's financial rating prompted the Bureau to notify plaintiff that it was required to provide alternative security in the amount of $35 million in order to retain its self-insured status under the Act. L.J.S.F. ¶¶ 77-78.  When plaintiff was unable to obtain a replacement bond for the downgraded Lumbermens' bond, the Bureau found that plaintiff was in violation of 34 Pa. Code § 125.  Id. ¶ 78.  Plaintiff and the Bureau eventually entered into an agreement whereby plaintiff could maintain its self-insured status by providing security in the form of a cash trust that obligates plaintiff to make cash deposits to the trust over a period of several years.  Id. ¶ 79-80.[9]  The Bureau did not, however, release Kemper from its liability under the Lumbermens bond.  Id. ¶ 81.

On August 5, 2002, the Surety Association of America ("SAA"), an industry group that operates on behalf of surety companies on a national level, submitted a proposed manual rule to the Pennsylvania Insurance Department that would permit its members to charge a premium on

_____

[9]    Specifically, USS is required to make annual payments to the cash trust over a ten-year period.  Following an initial payment, USS agreed to deposit additional security with the Bureau over the next nine years "based upon the Bureau's calculation of USS' outstanding liability less the Bureau's estimation of the value of security deposited by USS, the difference of which shall be divided by the number of years remaining on the settlement."  L.S.S.F.  ¶ 46.

terminated SIWC bonds.  Id. ¶ 23.  The SAA manual does not apply to Lumbermens because

Kemper files its own rate manual.  The SAA's proposed rule, which the SAA indicated would

"apply to all policies *written on or after* December 1, 2002," stated as follows:

> In the event the surety bond is cancelled by the surety or bond principal, and such
> cancellation does not affect the surety's liability for compensation for injuries to
> the principal's employees and other compensable events occurring prior to the
> date of cancellation, renewal premiums shall be charged.  Such renewal premium
> shall be based on the penal sum of the bond.  Annual renewal premiums shall be
> charged until the surety is released from all liability by the obligee.

Id. Ex. C (emphasis added).  Kemper did not file a similar manual rule with the Pennsylvania

Insurance Department.


## IV.    Procedural History

On October 24, 2002, plaintiff filed a complaint against Federal (the "Federal action") in

the Court of Common Pleas of Allegheny County at Docket No. G.D. 02-20286, seeking a

declaratory judgment that it had no continuing obligation to pay premiums on twelve terminated

workers' compensation surety bonds issued by Federal.  Plaintiff filed a timely notice of removal

in this court, and the case was also removed to this court pursuant to 28 U.S.C. §§ 1441(a) and

1446.

Also, on October 24, 2002, plaintiff filed a complaint against Lumbermens (the

"Lumbermens action") in the Court of Common Pleas of Allegheny County at Docket No. G.D.

02-20284, seeking a declaratory judgment that it does not have an obligation to pay Lumbermens

any additional payments for Lumbermens' continuing liability under the surety bond.  Plaintiff

filed a timely notice of removal in this court, and the case was removed pursuant to 28 U.S.C. §§

1441(a) and 1446.  On January 7, 2004, the court granted plaintiff leave to file an amended

complaint.  Plaintiff's amended complaint contained a claim at count two for breach of contract alleging that Lumbermens breached its obligation to plaintiff under the surety bond by failing to maintain an appropriate credit/financial rating, thus requiring plaintiff to obtain replacement security in order to maintain its self-insured status.  Defendant filed an answer to plaintiff's amended complaint, along with counterclaims for breach of contract (count one), breach of implied-in-fact contract (count two), unjust enrichment (count three), and for a declaratory judgment that USS is obligated: (i) to pay Lumbermens a premium in the amount of $1,312,500 for each annual period dating back to August 12, 2002, until such time that USS causes the release of Lumbermens under the bond; and (ii) to procure the discharge of Lumbermens from the SIWC bond by posting sufficient replacement security (count four).

On April 21, 2003, an order was entered consolidating the Federal action, filed in this court at Civil No. 03-307, with the Lumbermens action, filed at Civil No. 02-2108. After the completion of discovery, the parties filed cross-motions for summary judgment in both the Federal action (Doc. Nos. 41, 48) and the Lumbermens action (Doc. Nos. 43, 45).  The issue presented in each of the cross-motions is whether defendants may charge plaintiff a premium for post-termination liability under their respective SIWC bonds.  Two additional issues presented in the Lumbermens action are: (1) whether Lumbermens breached its contractual obligations to plaintiff when its financial ratings were lowered beyond the Bureau's acceptable rate in January 2003; and (2) whether USS breached its contractual obligations to Lumbermens by, *inter alia*, failing to employ all reasonable efforts to procure the discharge of the Lumbermens' bond.

*Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249.  The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1ˢᵗ Cir. 1993) (citing WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d. Cir. 1956), cert.denied, 355 U.S. 964 (1956) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or *otherwise made admissible in evidence*.") (emphasis added).

*Analysis*

**I.**   **Under the undisputed facts of record, plaintiff is not obligated to pay additional premiums to defendants for terminated SIWC bonds**

The essential function of the court in deciding the parties' cross-motions for summary judgment is to determine the nature of the agreements between the parties.  In undertaking the interpretation of a contract under Pennsylvania law, the court must begin with the language of the

contract itself.  Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. Ct. 1982) (stating

that it is "fairly settled" that "the intent of the parties to a written contract is contained in the

writing itself").  The goal of contract interpretation is "to discover the parties' objective mutual

intent," and Pennsylvania law follows the presumption that "the parties' mutual intent can be

ascertained by examining the writing."  Duquesne Light Co. v. Westinghouse Electric Corp., 66

F.3d 604, 613 (3d Cir. 1995); see also Mellon Bank N.A. v. Aetna Business Credit, 619 F.2d

1001, 1009 (3d Cir. 1980) ("The strongest external sign of agreement between contracting parties

is the words they use in their written contract.").

The court's task is made difficult in this case by the fact that the two written documents

that form the agreement between plaintiff and each of the defendants (the SIWC bond and the

indemnity agreement) are silent as to whether plaintiff is obligated to pay a premium on

terminated SIWC bonds.  With the exception of California Surety Bond No. 8150-39-45 issued

by Federal (which provides that the bond can be amended by "agreement of the parties" as to the

premium or premium rate), none of the SIWC bonds issued by Federal or Lumbermens even

mentions the payment of premiums to defendants, let alone the payment of premiums for

terminated SIWC bonds.  See F.J.S.F. ¶ 46; App. to F.J.S.F. (Doc. No. 37) Exs. A-L; L.J.S.F.

Ex. A.  Each of the bond forms, which are drafted by the respective governmental entities that

regulate that state's Bureau of Workers' Compensation, contain non-negotiable terms.  In that

respect, the imposition of long-tail liability on a SIWC bond surety cannot be modified by the

parties.  The non-negotiable terms are commercial realities that the parties confront within the

confines of the SIWC market.  In contrast, the indemnity agreements entered into between the

parties are contractual documents containing terms that may be freely negotiated between the

parties.  Despite this fact, the indemnity agreements entered into between the parties do not

14

mention the payment of premiums for terminated SIWC bonds.  The Federal indemnity

agreement contains no language regarding premium payments, while the Lumbermens indemnity

agreement states only that plaintiff agrees to indemnify Lumbermens "immediately upon demand

for any premium due."  App. to F.J.S.F. Ex. M; L.J.S.F. Ex. F.

Notwithstanding the fact that there is no written agreement between plaintiff and either of

defendants regarding premium payments, the parties stipulated that the payment of an annual

agreed-upon annual premium was required consideration for the issuance of each of the SIWC

bonds at issue.  F.J.S.F. ¶ 18-19, 36; L.J.S.F. ¶ 34.  Although the parties differ as to the resolution

of the ultimate issue whether defendants are able to continue to charge premiums once the SIWC

bonds are terminated, much of the parties' understanding as to the nature of their relationship

with respect to premium payments is not in dispute.  For example, the parties agree that

defendants were permitted to charge annual premiums based upon their continuing evaluation of

whether plaintiff would be able to meet its workers' compensation obligations that became due,

even though the bond forms do not mention annual premium payments as consideration for

issuance of the bond.[10]  Plaintiff, in fact, paid annual premiums to Federal for nearly a half-

---

[10]     Defendants have spent a considerable effort in their respective briefs in an attempt
to educate the court as to the distinction between traditional insurance premiums, which
generally depend upon the insurer's assessment of the risk of loss to the insured's person or
property, and surety premiums, which depend upon the surety's assessment that its principal will
not be able to meet an obligation that becomes due.  See e.g., Superior Precast v. Safeco Ins. Co.
of America, 71 F.Supp.2d 438, 451-52 (E.D. Pa. 1999) (holding specifically that the plaintiff
could not bring a bad faith claim under the Pennsylvania Bad Faith Statute arising out of a surety
agreement).  Defendants' effort has been helpful in defining the distinction between insurance
and suretyship.  As noted in Superior Precast regarding the differences between suretyship and
insurance:

> While insurance is an agreement by which one undertakes for a consideration to
> pay money to another on the death, destruction, loss, or injury of someone or
> something, a contract of suretyship is one to answer for the debt, default, or
> miscarriage of another . . . .  The contract creates a tripartite relation between the
> party secured, the principal obligor, and the surety, and the rights, remedies, and

century and paid premiums to Lumbermens over a two-year period.  There is further agreement

that the premium rate may increase or decrease at the expiration of the annual premium term

upon agreement of the parties.  At that point, the principal may agree to the increase, or decide,

as plaintiff did with respect to St. Paul, to go shopping for a better rate.[11]  In any event, if an

agreement cannot be reached, either party has the right under the language to terminate the bond.

Second, the submissions of the parties reveal that there is no real dispute over whether the

rates defendants attempted to charge plaintiff were *per se* reasonable.  In this respect, the court

disagrees with the argument raised by both defendants that the "filed-rate" doctrine should be

applied to stay the dispute and refer the matter to the Pennsylvania Insurance Department.  The

"filed-rate" doctrine generally provides that "where regulated companies are required by federal

or state law to file proposed rates or charges with a regulatory agency, any rate approved by the

agency 'is per se reasonable and unassailable in judicial proceedings brought by ratepayers.'"

Steven v. Union Planters Corp., No. Civ. A. 00-CV-1965,  2000 WL 33128256 *3 (E.D. Pa.

August 22, 2000)(quoting Wegoland Ltd. v. NYNEX Co., 27 F.3d 17, 18 (2d Cir.1994)).  The

dispute in this case, however, does not concern a rate challenge brought by plaintiff as to the

reasonableness of the respective premium rates defendants are attempting to charge for long-tail

---

defenses of a surety cannot be disassociated from this relationship.
Id. at 451; see Geode v. Mutual Fire, Marine and Inland Ins. Co., 572 A.2d 798, 806 (1990)
(stating that "surety bonds are in the nature of commercial guarantee instruments rather than
policies of insurance").  The distinction between suretyship and insurance, however, does not aid
the court in resolving the underlying merits of whether defendants could charge a premium for
terminated SIWC bonds.  That endeavor is centered around determining the scope of the
agreement between the parties – regardless of how that agreement is characterized.

[11]     As stated in Lumbermens' Supplemental Statement of Facts: "If a principal is
dissatisfied with renewal premiums charged on a bond, the principal has the option of moving the
business to another surety or replacing the bond with security of its own that is posted directly
with the state."  L.S.S.F. ¶ 14.

liability.  Plaintiff does not contest that either Federal or Lumbermens could attempt to charge

premium amounts to the extent that such rates were approved by each state's respective insurance

department.  See Pl.'s Br. in Opp. (Doc. No. 58) at 10; Pl.'s Br. in Opp. (Doc. No. 55) at 6-7.[12]

Rather, the dispute in this case centers around the nature of the agreement between the parties

and whether that agreement provides that defendants may charge plaintiff premiums for

terminated SIWC bonds. [13]

  Third, with the written documents providing no basis to discern the parties' objective

intent regarding premium payments for terminated SIWC bonds, the court considers whether the

parties' objective intent can be interpreted through the parties' course of performance and course

---

[12] The court disagrees with defendants that the respective rate manuals should be
incorporated into the agreements between the parties.  Although it is true that "when a contract
refers to a separate document, a court may examine the language of the other document to
ascertain the intent of the parties[,]" there is no language in the agreements between the parties to
suggest that the surety rate manuals were incorporated into the agreements.  See West
Development Group, Ltd. v. Horizon Financial, F.A., 592 A.2d 72, 75 (Pa. Super. Ct. 1991).
Furthermore, this court's independent research did not uncover any decisions which held as a
matter of law that surety rate manuals are impliedly incorporated into suretyship agreement.  The
Pennsylvania Superior Court's decision in Borough of Ambridge v. Home Mut. Cas. Co., 142
A.2d 367, 370 (1958), is inapplicable to the facts of this case because the manual at issue in that
decision was "expressly referred to by code number in appellant's policy."  In that regard, it was
incorporated into the policy by reference.  There is no such incorporation clause in the present
agreements between the parties.  As a result, the court concludes that defendant's surety rate
manuals are not part of the respective agreements between the parties.

[13] To the extent that the court would consider the parties' rate manual filings, those
filings weigh against defendants.  Federal and Lumbermens' rate filings in existence at the time
the various bonds were entered into did not contain language permitting defendants to impose
post-termination premiums.  The letter sent by the SAA to the Pennsylvania Insurance
Department along with its proposed manual rule regarding post-termination premium payments
does not establish that its members would mandatorily charge post-termination premium
payments.  Rather, the letter states that "renewal premiums *may* be charged for a bond that has
been cancelled but not released as to prior liability."  L.J.S.F. Ex. C (emphasis added) (The SAA
rule was virtually identical to Federal's 2001 rule modification.).  In this context, it is important
to remember that an approved manual rule permits the surety to charge premiums to the full
extent of the rule, but that the nature of the agreement between the parties governs what the
surety may actually charge under the agreement.

of dealing, as well as custom in the industry and usage of trade.  Sunbeam Corp. v. Liberty Mut.
Ins. Co., 781 A.2d 1189, 1193 (Pa. 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS §
202(5)).  The course of performance between the parties supports the parties' stipulation that the
payment of annual premiums was an implicit part of the parties' respective agreements, at least
with respect to active SIWC bonds.  The course of dealing between plaintiff and Federal
demonstrates that at the time the various bonds were entered into between the parties, Federal
was aware of the nature of long-tail liability.  Throughout the course of their forty-eight year
relationship, Federal never charged USS a premium for terminated SIWC bonds, irrespective of
whether Federal was released from all liability under the bonds.  F.J.S.F. ¶¶ 26-27.  If a SIWC
bond was terminated during the course of a particular premium period, Federal's long-standing
practice was to refund USS a pro-rated premium amount.  See note 4, supra.  This course of
dealing between USS and Federal was customary in the surety industry.  Lumbermens stipulated
that prior to the date it entered into the bond with USS, it was aware of the nature of long-tail
liability as well as the custom within the industry that sureties did not charge principals a
premium for terminated SIWC bonds.  L.J.S.F. ¶ 18.  Under this undisputed factual record, the
court has no difficulty concluding that the objective understanding between the parties at the time
the bond agreements were entered into was that: (1) the sureties expected to remain on the hook
for long-tail liability in the event that either party terminated the bond; and (2) if such termination
occurred, the sureties would not charge premiums for terminated SIWC bonds.

In addition, the court rejects defendants' argument that State ex rel. Pope v. U.S. Fire Ins.
Co., No. E2002-01092-COA-RC-CV, 2003 WL 649111 (Tenn. Ct. App. February 28, 2003),
provides that sureties are implicitly permitted unilaterally to charge post-termination premiums
without issuing a new bond.  The issue in that decision was quite different from the issue in the

present case.  The issue in <u>Pope</u> was whether SIWC bonds could be aggregated by the amount of years they were in effect to satisfy outstanding claims, or whether the sureties' liability was limited to the penal sum of the bonds.  The Court of Appeals of Tennessee determined that the bonds were issued for an indefinite term to satisfy a continuing obligation that was "operable *until cancelled*."  <u>Id</u>. *2 (emphasis added).  The fact that the sureties charged an annual premium based upon an evaluation of the "risk associated with an indefinite obligation on an on-going basis" did not transform the continuous bond into a series of bonds with set one-year terms.  <u>Id</u>. *3.  On this basis, the court concluded that the sureties' liability would not be aggregated for each year the bonds were in effect.  The Tennessee Supreme Court, reviewing the applicable state statute governing SIWC bonds and the language of the bond form at issue, affirmed the court of appeals' determination that the surety bonds were not cumulative.  <u>State of Tennessee ex rel.</u> <u>Pope v. United States Fire Insurance Co.</u>, 145 S.W.3d 529 (Tenn. 2004).  The court noted that "annual premiums do not make a series of contracts," and that "the parties did not intend that the liability created by the surety bonds would be cumulative and instead intended the bonds to be of a single, continuous term with the maximum liability of the penal sum of the bond."  <u>Id</u>. at 538. Nowhere in either decision did the court address a surety's ability to charge premiums after a SIWC bond was cancelled.[14]  As a result, the court does not find either <u>Pope</u> decision helpful with respect to the pending dispute.

In summation, the court finds that the respective agreements between USS and defendants do not permit defendants to charge USS a premium on terminated SIWC bonds to which the

---

[14]        In fact, if anything, the court of appeals' decision in <u>Pope</u> contains language suggesting that sureties may not be able to charge premiums following the cancellation of continuous bond obligations.  <u>Pope</u>, 2003 WL 649111 at *2 (stating that bonds were issued for an indefinite term to satisfy a continuing obligation that was "operable until cancelled").

sureties remain subject to long-tail liability.  Defendants were aware of the unique nature and inherent risks[15] of long-tail liability with respect to SIWC bonds when they entered into their respective agreements with USS.  Although the course of performance demonstrates that prior to termination the payment of an annual premium was part of the agreements between the parties (which could be modified annually), there is no objective evidence to support a conclusion that defendants could charge post-termination premiums.  In addition, the court was guided by the course of dealing between Federal and USS, as well as the industry custom (stipulated to by both defendants) not to charge post-termination premiums at the time the parties entered into their agreements.  Furthermore, the court declines to read the surety rate manuals as part of the agreements of the parties (let alone apply such rule changes retroactively) in the absence of an incorporation clause in either the bonds or the indemnification agreements, or in the absence of any other objective evidence that the manual rules were part of the agreements between the parties.  Accordingly, the court will enter summary judgment in favor of plaintiff and correspondingly enter a declaratory judgment with respect to count one of plaintiff's complaints that plaintiff does not have an obligation to pay defendants any additional payments for defendants' continuing liability under the surety bonds at issue.[16]

---

[15]    For example, the principal might become insolvent, or the surety might not be released from its post-termination obligations by the Bureau.

[16]    Based upon the court's determination above that the filed-rate doctrine is inapplicable to the present case, the court will also deny defendant Lumbermens' motion to stay the proceedings (Doc. No. 45).

## II.     There is insufficient evidence for a reasonable factfinder to conclude that Lumbermens breached its obligation to plaintiff under the surety bond by failing to maintain an appropriate credit/financial rating

Count two of plaintiff's amended complaint alleges that Lumbermens breached its agreement with plaintiff by failing to maintain an appropriate credit/financial rating, thus requiring plaintiff to obtain replacement security in order to maintain its self-insured status. Plaintiff devotes roughly two pages of its brief in support of its motion for summary judgment with respect to count two.  In its submission, plaintiff does not cite to any contractual provision in support of its claim that defendant's primary obligation was to provide acceptable security for plaintiff's SIWC obligations.  Plaintiff's omission is probably due to the fact that none exists, as neither the bond nor the indemnity agreement mentions the maintenance of "an appropriate credit/financial rating" as a condition of the agreement.[17]  The regulation cited by plaintiff, 34 PA. CODE § 125.9, does not state that there is any specific requirement imposed upon the surety to maintain an acceptable rating, but rather imposes a requirement on the principal to obtain replacement security if the surety's credit/financial rating drops below the proscribed acceptable rating.  Accordingly, because the record presented to the court is devoid of any evidence from which the court could find merit to plaintiff's claim at count two, the court denies plaintiff's motion for summary judgment as to count two.

---

[17]     No course of dealing/course of performance evidence was submitted with respect to plaintiff's claim at count two.  Likewise, there is no evidence of industry custom that would permit the court to read such a provision into the parties' agreement.

### III.   Material issues of fact exists with respect to whether plaintiff's efforts to procure the discharge of Lumbermens' bond were "reasonable"

Lumbermens' counterclaim at counts one, three, and four alleges that USS breached its obligation under paragraph 5 of the Indemnity Agreement "to employ all reasonable efforts to procure the discharge of Surety from any bond, and all liability by reason thereof."[18]  Key to Lumbermens' motion is its assertion that no material issue of fact exists as to whether plaintiff's efforts to release Lumbermens from its bond obligations were "reasonable."  The word "reasonable" is not defined in the indemnity agreement; thus, the court must define the term in accordance with its accepted meaning.  See Mellon Bank N.A. v. Aetna Business Credit, 619 F.2d 1001, 1013 (3d Cir. 1980).  Black's Law Dictionary defines the word "reasonable," *inter alia*, as: "Fair, proper, just, moderate, suitable under the circumstances; Fit and appropriate to the end in view."  BLACK'S LAW DICTIONARY (6th ed. 1990) 1265.  The plain meaning of the term requires an examination of all the surrounding factual circumstances in order to reach a determination whether an action is appropriate.

At the summary judgment stage, the court is required to grant all reasonable inferences to the non-moving party.  FED.R.CIV.P 56(c).  Applying this familiar standard, the court concludes that issues of material fact regarding whether plaintiff's conduct was "reasonable" precludes this court from imposing summary judgment.  See Serianni v. Gulf Oil Co., 662 F.Supp. 1020, 1024 (E.D. Pa. 1986) (motion for summary judgment denied because material issue of fact existed as to whether plaintiff's failure to comply with contractual provisions "was beyond his reasonable control").  There is evidence on the record that plaintiff had available $800 million dollars that

---

[18]     Paragraph 5 of the Indemnity Agreement states: "Upon request of Surety, the Indemnitor will employ all reasonable efforts to procure the discharge of Surety from any bond, and all liability by reason thereof."  L.J.S.F. Ex. F.

plaintiff could have dedicated toward finding replacement security. There is also evidence, however, that plaintiff was unable to obtain a replacement SIWC bond in the hardened surety market following the cancellation of the Lumbermens bond. L.J.S.F. ¶ 78. It is further undisputed that plaintiff did enter into a trust agreement with the Bureau permitting it to maintain operations in Pennsylvania, but that the Bureau did not release Lumbermens from its long-tail liability obligations under the bond. In addition, there is evidence that plaintiff considered several options to meet its workers' compensation obligations, L.S.S.F. ¶ 5, but there is insufficient evidence on the record for a finder of fact to conclude that plaintiff's failure to take any of these options was *per se* unreasonable. Accordingly, the court will deny defendant Lumbermen's motion for summary judgment as to its counterclaims at count one, three, and four.

### *Conclusion*

**AND NOW**, this 31st day of August 2005, upon consideration of the motions for summary judgment submitted by the parties, the briefs in support and opposition, and the factual record presented to the court, the court hereby enters the following order:

• Plaintiff's motion for summary judgment (Doc. No. 41) is **GRANTED** as to count one of plaintiff's complaint against Defendant Federal. In accordance with this ruling, **JUDGMENT** is hereby **ENTERED** against Defendant Federal and in favor of plaintiff. The court declares that plaintiff has no obligation to pay Defendant Federal any additional payments for Federal's continuing liability under the surety bonds it issued to plaintiff.

• Plaintiff's motion for summary judgment (Doc. No. 43) is **GRANTED IN PART AND DENIED IN PART.** Plaintiff's motion is **GRANTED** as to count one. The court declares that plaintiff has no obligation to pay Defendant Lumbermens any additional

payments for Lumbermens' continuing liability under the surety bond it issued to plaintiff.  Plaintiff's motion for summary judgment is **DENIED** with respect to count two of plaintiff's amended complaint.

- Defendant Lumbermens' motion for summary judgment (Doc. No. 45) is **DENIED** as to counts one, three, and four of defendant's counterclaims.

- Defendant Lumbermens' motion to stay proceedings (Doc. No. 45) is **DENIED.**

- Defendant Federal's motion for summary judgment (Doc. No. 48) is **DENIED**.


By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge


cc:     counsel of record